UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

| | |
|---|---|
| **Aamir SHAIKH**, *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) Case No. 1:22CV231 TJK |
| | ) |
| v. | ) |
| | ) |
| **U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

**DEFENDANTS' MEMORANDUM IN RESPONSE TO PLAINTIFFS'**
**APPLICATION FOR TEMPORARY RESTRAINING ORDER**

**I.  Introduction and Factual Background**

Plaintiffs are five immigration detainees who are or were held by U.S. Immigration and Customs Enforcement ("ICE") in five different detention facilities in five different states. As set forth in Plaintiffs' Complaint, all five have received and completed their initial COVID-19 vaccinations. Dkt. 1, ¶¶ 26, 28, 30, 32, 34. In their Application for Temporary Restraining Order ("TRO") of January 31, 2022 (Dkt. 2), three of the five plaintiffs, (Shaikh, Solis, and Hernandez-Villalobo) request that this Court enter an order "requiring . . . ICE and U.S. Department of Homeland Security ("DHS") to immediately make available and administer COVID-19 booster shots to them in accordance with the Centers for Disease Control and Prevention's ("CDC") guidance on COVID-19 vaccine booster shots." In the accompanying Complaint, all five allege violations of their Fifth Amendment Rights (due process, confinement amounting to punishment), the Administrative Procedure Act ("APA") and Rehabilitation Act (failure to provide

reasonable accommodation to persons with disabilities), and all Plaintiffs except Mayen allege violations of the APA and *Accardi* Doctrine (failure to follow agency policy). Dkt. 1, pp. 22-26.

All of Plaintiffs' claims concern allegations about COVID-19 response policies and procedures at the detention centers where they are housed. Plaintiffs' motion for a TRO should not be granted because their claims have been rendered moot through the administration of the requested mRNA booster vaccinations. Furthermore, Plaintiffs' claims are subject to dismissal because they are duplicative of an existing class action where all three TRO Plaintiffs are class members, and should otherwise be transferred to the correct venue, as set forth below. For these reasons, and as further argued below, Plaintiffs cannot demonstrate a likelihood of success on the merits and cannot meet the remaining standards for entry of a TRO. Their motion for TRO should, therefore, be denied.

## II. Argument

A. <u>TRO Heightened Standard of Review Where Plaintiffs Seek Action, Not Status Quo</u>

A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). The standard for obtaining a TRO is identical to that for obtaining a preliminary injunction. *Hall v. Johnson,* 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009). To be entitled to a temporary restraining order (or a preliminary injunction), a plaintiff must demonstrate that (1) there is a substantial likelihood of ultimate success on the merits; (2) a restraining order or injunction is necessary to prevent irreparable injury; (3) the threatened injury outweighs the harm that the restraining order or injunction would inflict

on the other party; and (4) the restraining order or injunction would not be adverse to the public interest. *AAmer v. Obama,* 742 F.3d 1023, 1038 (D.C. Cir. 2014).  When seeking this remedy, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014).  Where the Government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Where a motion seeks a "mandatory injunction," as Plaintiffs do here, to force the government to act, rather than simply maintain the status quo, the motion is adjudicated under a heightened standard.  *See Strait Shipbrokers Pte. Ltd., v. Blinken*, 2021 U.S. Dist. LEXIS 152112, *18-19 (D.D.C. August 12, 2021).  "Indeed, as a rule, when a mandatory preliminary injunction is requested, the district court should deny such relief unless the facts and law clearly favor the moving party.'' *Id*. (internal quotation marks and citation omitted).

As set forth below, Plaintiffs cannot show a likelihood of success on the merits, much less the heightened standard that the facts and law are "clearly in favor of the moving party."

B.      <u>Plaintiffs Cannot Demonstrate the Facts and Law are Clearly in Their Favor</u>

The TRO Plaintiffs cannot demonstrate that the facts and law are "clearly in their favor," or even that they have a substantial likelihood of success on the merits, because their claims are moot.  The requested relief stated in Plaintiffs' memoranda supporting their applications for TRO and the related motion for a preliminary injunction is "medical consultation"[1] (Dkt. 2, p. 36, Dkt.

---

[1] Although Plaintiffs do not detail the meaning of "medical consultation" in their pleadings, Defendants take it to mean "information" and "education" as to booster shots as referenced in Plaintiffs' motion for preliminary injunction.  "Plaintiffs report they were aware of the existence and benefits of booster shots only from watching television, reading the news, or

3, p.36) and the administration of mRNA booster vaccinations to each plaintiff.  Dkts. 2-3.

    1. <u>Plaintiffs Shaikh's and Cardenas Solis' Claims Are Moot Because They Have Received the Requested Boosters</u>

"In general, a case becomes moot where the activities for which an injunction is sought have already occurred and cannot be undone."  *Monzillo v. Biller*, 735 F.2d 1456, 1459 (D.C. Cir. 1984).  All five Plaintiffs received their mRNA booster vaccinations since the filing of this action.  *See* Decls. of John Hartnett as to Plaintiff Shaikh, Christopher Jones as to Plaintiff Solis, Robert Alfieri as to Plaintiff Hernandez Villalobo, Moises Becerra as to Plaintiff Rojo Rocha, and Joshua Reid as to Plaintiff Mayen Mayen, attached as Exhibits 1-5.

    2. <u>All Three TRO Plaintiffs Are *Fraihat* Class Members</u>

TRO Plaintiffs also cannot show that the facts and law are clearly in their favor in this matter because their claims are duplicative of an existing class action covering the identical claims, which necessitates the dismissal of their claims in the instant case.  The TRO Plaintiffs are all identified class members in the ongoing class action regarding ICE detention facilities, including the specific issues of COVID-19 vaccinations and care of medically vulnerable individuals.  *See Fraihat, et al. v. U.S. Immigration and Customs Enforcement, et al.*, Case No. 19-1546 (C.D. Cal.) (Bernal, J.).  There, the court provisionally certified two nationwide subclasses of ICE detainees based on their disability or higher risk of COVID-19 complications based on age, pregnancy, or specified chronic health conditions.  *See Fraihat*, Case No. 19-1546, Dkt. 133.  The court issued a series of

---

conversations with loved ones."  Dkt. 2, p.12.  It would appear the "medical consultation" requested in the preliminary injunction is related to encouraging Plaintiffs to accept the booster vaccination.  All Plaintiffs now have in fact accepted the boosters, so further medical consultation would be unnecessary.

orders addressing the class's conditions of confinement including that ICE: issue a performance standard or supplement to the COVID-19 Pandemic Response Requirements, U.S. Immigration and Customs Enforcement and Removal Operations of Apr. 10, 2020 ("PRR") defining the minimum acceptable detention conditions for detainees with the identified Risk Factors; *see Fraihat*, Preliminary Injunction Order, Dkt. 132 at 38, continue to update the performance standard consistent with expert guidance and the CDC Detention Guidance, with the goal of exceeding BOP and state prison system response levels; *see Fraihat*, Order Granting in Part Plaintiffs' Motion to Enforce Preliminary Injunction, Dkt. 172 at 11; and requiring that ICE make vaccines available to all subclass members; *see Fraihat*, Order Adopting Special Master's First Report and Recommendation, Dkt. 312 at 2. In October 2021, the Ninth Circuit reversed the preliminary injunction, (16 F.4th 613 (9th Cir. 2021)), but the court's orders remain in effect because the court of appeals mandate has not issued while the parties engage in mediation. *See Fraihat v. United States Immigration & Customs Enf't*, Docket No. 20-55634 (9th Cir.).

Thus, the TRO Plaintiffs' claims that any failure or delay by the government in providing them COVID-19 vaccine booster shots is a constitutional and/or *Accardi* violation are directly tied to Defendants' compliance with the *Fraihat* court's orders as overseen by the court-appointed special master and also may implicate the parties' settlement efforts. Such compliance litigation should be filed in the court and in the case that is the source of the challenged obligation, a recognized jurisdictional principle. *See, e.g.*, *Reebok Int'l Ltd. v. McLaughlin*, 49 F.3d 1387, 1390 (9th Cir.) ("District courts do, and must, have the authority to punish contemptuous violations of their orders.") (citing 18 U.S.C. § 401; *International Union, UMW v. Bagwell*, 512 U.S. 821, 831 (1994), *cert.*

5

*denied*, 516 U.S. 908 (1995)). Further, this proposition is built on the longstanding principle that enforcement of an injunction through a contempt proceeding must occur in the issuing court because contempt is an affront to the court issuing the order. *See, e.g.*, *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 452 (1932); *In re Debbs*, 158 U.S. 564, 594–95 (1895) ("[T]he power of a court to make an order carries with it the equal power to punish for a disobedience of that order, and the inquiry as to the question of disobedience has been, from time immemorial, the special function of the [ordering] court . . . . To submit the question of disobedience to another tribunal, be it a jury or another court, would operate to deprive the proceeding of half its efficiency. . . . [T]he sole adjudication of contempts, and the punishments thereof belong[] exclusively . . . to each respective court."), *abrogated on other grounds by Bloom v. Illinois*, 391 U.S. 194 (1968).

Duplicative litigation is disfavored in the federal courts because of the risk of inconsistent judgments, as well as the waste of parties' and judicial resources. *See Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976). It is not necessary that the suits be "identical," just that "substantially the same parties are litigating substantially the same issues simultaneously in two fora." *Saddler v. AMEC Foster Wheeler Env't & Infrastructure, Inc.*, 253 F. Supp. 3d 210, 219 (D.D.C. May 26, 2017). Class actions are defined by Federal Rule of Civil Procedure 23, the purpose of which is to is to permit uniform relief to be granted to a class as a whole, given that "[t]he primary goal[] of class action lawsuits [is] to avoid a multiplicity of actions and the risk of inconsistent or conflicting adjudications," *Newburg on Class Actions* § 10:33 (5th ed.). "[W]hen an individual lawsuit filed by a class member raises claims of a nature similar to or overlapping with a pending class action, courts have consolidated the proceedings and

6

included the individual complaint in the class action." *Univ. Legal Servs. v. St. Elizabeths Hosp.*, 2005 U.S. Dist. LEXIS 36132 (D.D.C. July 22, 2005). Since class members generally "cannot relitigate issues raised in a class action after it has been resolved, a class member should not be able to prosecute a separate equitable action once his or her class has been certified . . ." *Goff v. Menke*, 672 F.2d 702, 704 (8th Cir. 1982).

Applied to this case, Plaintiffs' class has been certified in *Fraihat*. Any decision by this Court risks the creation of inconsistent judgments, causing confusion and potentially inconsistent treatment among class members, and defeating the purpose of uniform prosecution and resolution of these claims via the class action vehicle. Given the closeness of the claims, the risk of inconsistent judgments is particularly acute here, especially where the district court in *Fraihat* already has ordered injunctive relief on behalf of the class that includes all three TRO Plaintiffs, and Defendants already have made extensive efforts toward compliance with the preliminary injunction order. *See* Declaration of Dr. Ada Rivera attached as Exh. 6; (https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf). Further litigation in this Court would only impede the direction of resources toward the expeditious implementation of the *Fraihat* orders, ongoing efforts between the parties in *Fraihat* to continue responding to the ever-evolving COVID-19 pandemic, ongoing mediation efforts, and the prompt disposition of that case.

Because Plaintiffs' claims are duplicative of the existing *Fraihat* class action, they are subject to dismissal. Plaintiffs cannot, therefore, demonstrate the facts and law are clearly in their favor.

3.  <u>Improper Venue – Plaintiffs' Claims Should be Severed and Transferred</u>

Should this Court look beyond Plaintiffs' inability to demonstrate that the facts and law are clearly in their favor due to the mootness of the TRO Plaintiffs' claims and the duplication of the *Fraihat* litigation, Plaintiffs also cannot show that the facts and law are clearly in their favor because their claims are subject to severance and transfer. Plaintiffs allege that venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because "Defendants are agencies of the United States," and without explanation or supporting factual allegations, state that "a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District." Dkt. 1 ¶ 10. But Plaintiffs allege no actions or omissions taken in this district and name no responsible individuals in this district. Rather, the allegations all concern actions and alleged omissions occurring in five different states, all outside this district. Dkt. 1 ¶¶ 11-15, 26-35.

Section 1391(e) specifies that such an action may "be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). However, it is well established that "the location of the agency's headquarters office [in the District of Columbia] does not automatically establish venue in this district." *Bell v. United States*, Civ. A. No. 18-0738, 2019 WL 1427246, at *2 (D.D.C. Mar. 29, 2019) (citing *Bartel v. Federal Aviation Admin.*, 617 F. Supp. 190, 199 (D.D.C. 1985)). As the D.C. Circuit has explained, courts in this district in particular "must examine challenges to personal jurisdiction and venue carefully to guard against the danger that a plaintiff might manufacture venue in the District of Columbia."

*Cameron v. Thornburgh*, 983 F.2d 253, 256 (D.C. Cir. 1993).  For the "convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  This statute thus vests "discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'"  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)).

Upon consideration of the private and public interests regarding transfer, the Court should order that any live claims be severed and transferred.  *See, e.g., Bederson v. United States*, 756 F. Supp. 2d 38, 46 (D.D.C. 2010).  The private interest factors include: "(1) the plaintiff's choice of forum; (2) the defendant's preferred forum; (3) the location where the claim arose; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof."  *Vasser v. McDonald*, 72 F. Supp. 3d 269, 282 (D.D.C. 2014).  The public interest factors include: "(1) the transferee's familiarity with the governing law; (2) the relative congestion of the courts of the transferor and potential transferee; and (3) the local interest in deciding local controversies at home."  *Id.*  Here, the private interest factors favor of transfer.  While the court may give some weight to a plaintiff's choice of forum*, see Fine v. McGuire*, 433 F.2d 499, 501 (D.C. Cir. 1970), that choice is not determinative, especially where, as here, Plaintiffs do not reside in the chosen jurisdiction and the venue chosen lacks an adequate nexus to the events in the case.  *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56 (1981); *Shawnee Tribe v. United States*, 298 F. Supp. 2d 21, 24 (D.D.C. 2002). Nor do Plaintiffs' Complaint or TRO application allege any relevant factual events occurred in this district.  Any alleged failure to adhere to

COVID-19 policies or precautions would be committed by officials where Plaintiffs are detained during the pendency of their removal actions. *See* Rivera Decl. at ¶¶ 28-29; Hartnett Decl. at ¶¶ 7-13; Jones Decl. at ¶ 8; Alfieri Decl. at ¶¶ 8-15.

The public interest factors also favor transfer. Indeed, "[t]he interest in deciding local controversies at home is the public interest factor of most importance[.]" *Bourdon v. Dep't of Homeland Security*, 235 F. Supp. 3d 298, 308 (D.D.C. 2017). To determine whether the case presents a local controversy, courts "consider a wide variety of actors, including: where the challenged decision was made; whether the decision directly affected the citizens of the transferee state; the location of the controversy . . .; and whether there was personal involvement by a District of Columbia official." *Id.* Here, the alleged failures related to COVID-19 boosters all occurred at a local level. Plaintiffs' allegations present a local controversy that should be decided by districts in which Plaintiffs are detained, as it is action in those facilities Plaintiffs seek to compel. This "most importan[t]" factor weighs heavily in favor of transfer. *Id.* at 308.

Even where there are multiple plaintiffs whose claims should be transferred to multiple different jurisdictions, severance and transfer is appropriate. "Courts have discretion to sever parties to effectuate transfer for judicial economy and convenience of the parties." *Pasem v. United States Citizenship & Immigration Servs.*, 2020 U.S. Dist. LEXIS 85818, *14 (D.D.C. May 15, 2020) (District court severed and transferred claims of ninety-five plaintiffs to the districts where the individual U.S. Citizenship and Immigration Services centers that were adjudicating their citizenship petitions were located after weighing the public and private interests outlined above). *Id*. at *7-15. Plaintiffs'

claims should, therefore, be severed and transferred to the appropriate federal districts for adjudication.

    4. <u>Plaintiffs Cannot Establish a Fifth Amendment Violation</u>

Plaintiffs allege that the failure of ICE to provide an mRNA booster between the time the CDC first announced a recommendation for the administration of booster shots to certain at-risk populations on October 21, 2021 (Dkt. 1, ¶ 20), and the filing of this action on January 31, 2022, is a violation of their Fifth Amendment due process rights, specifically that the failure is an unreasonable risk to Plaintiffs' health. *See* Dkts. 1 and 2. To succeed on this claim, Plaintiffs must show that their detention conditions are "objectively unreasonable," that Defendants knew, or should have known, that detention conditions posed an excessive risk to Plaintiffs' health, and intentionally or recklessly failed to provide booster vaccinations to overcome that excessive risk. *See Banks v. Booth*, 468 F. Supp. 3d 101, (D.D.C. 2020), *appeal dismissed, cause remanded*, 3 F.4th 445 (D.C. Cir. 2021).

Plaintiffs state that "failure to provide adequate protection against COVID-19 in jail or detention poses an unreasonable risk to the health of detainees." Dkt. 2 at p. 20. Plaintiffs argue that they have a "serious medical need" for boosters, and that the failure to have provided boosters as of the date of the filing of their action constitutes the necessary "reckless failure to act" due to the "subjective knowledge" of ICE of the risk to Plaintiffs, thereby constituting punishment in violation of their Fifth Amendment substantive due process rights. *Id*. at pp. 21-27. Plaintiffs cannot, however, show that Defendants have not provided "adequate protection against COVID-19." The COVID-19 pandemic has presented the scientific and medical communities new and truly unique challenges. As a

result of ever-evolving developments in both areas, public procedures to stop and slow the spread of the virus, medical treatments of those infected, and vaccination resources and protocols have changed on an almost week-to-week basis since the beginning of the pandemic in 2020. Since that time, ICE has been proactive in protecting the health and safety of all detainees, following relevant CDC guidance as it evolves, and establishing extensive safety and vaccination protocols. *See* Rivera Decl. at ¶¶ 8-34.

Since the beginning of the pandemic, ICE epidemiologists have tracked the outbreak and issued guidance to ICE Health Services Corp ("IHSC') staff for the screening and management of exposure among detainees. *Fraihat* Dkt. 124-1. In April 2020, ICE issued the first PRR, which was "designed to establish consistency across ICE detention facilities by establishing mandatory requirements and best practices in all detention facilities housing ICE detainees." Version 7 of the PRR was published on October 19, 2021. *Id.* Under the terms of the PRRs, facilities that hold ICE detainees must, among other things, "comply with the provisions of their relevant ICE contract or service agreement, [c]omply with the ICE national detention standards applicable to the facility," comply with CDC guidance, and take steps to identify and track detainees at high-risk for serious illness from COVID-19. *Id*. at p. 8. ICE has indeed provided "adequate protection against COVID-19" and have not put Plaintiffs at unreasonable risk.

With regard to COVID-19 boosters specifically, the CDC recommended boosters for at-risk groups beginning in mid-October, 2021, just four months ago. Dkt. 2, p.6. ICE began administering booster shots in November, 2021. *See* Rivera Decl. at ¶ 24. To be medically cleared for a booster, detainees must first either be fully vaccinated while in detention, or provide proof of prior vaccination. *Id*. at ¶¶ 16, 26. Vaccines (and boosters)

for detention facilities initially were allocated to and distributed by state and local health departments as part of the total COVID-19 vaccine distribution by the federal government to each state. *Id*. at ¶¶ 8-9. In June 2021, ICE received a supply of Janssen vaccines which it made available to detention centers upon request, and ICE is working with DHS to expand access specifically to mRNA vaccines to align its actions with the December 16, 2021 guidance from the CDC encouraging mRNA vaccines over the Janssen vaccine. *Id*. These actions taken by the ICE demonstrate that the government actions with regard to Plaintiffs' detention are not objectively unreasonable and that the government did not intentionally or recklessly fail to provide adequate care to Plaintiffs.

Further, although applying a different standard,[2] courts have determined that "mere delay" in treatment does not state a claim for violation of the Eight Amendment," *Charles 2X v. District of Columbia*, 834 F. Supp. 439, 442 (D.D.C. April 14, 1992), absent "some substantial harm to the patient." *Webb v. Hamidullah*, 281 Fed. Appx. 159, 167 (4th Cir. 2008). "Courts will not intervene upon allegations of mere negligence, mistake or difference of opinion." *O.K. v. Bush*, 344 F. Supp. 2d 44, 61 (D.D.C. 2004 (Bates, J.)).

Even if the Court was to accept as true Plaintiffs' assertions that there were "19.2 million new cases and over 55,900 new deaths in the past four weeks" (Dkt. 2, pp. 3-4), as of February 10, 2022, of the approximately 20,000 individuals in ICE detention, only four were currently hospitalized with COVID-19, and there have been only eleven deaths attributable to COVID-19 since the *beginning* of the pandemic, with the last occurring in October 2021, prior to the rise in infection numbers due to the Omicron variant. *See* Rivera

---

[2] Prisoners are provided Eight Amendment protections, while civil immigration detainees are provided the same basic protections by virtue of the Fifth Amendment Due Process Clause. *See C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 210 (D.D.C. 2020).

Decl. at ¶¶ 33-34.  While ICE works to avoid even a single death, these numbers show the success of the actions ICE has taken to protect detainees, including Plaintiffs.  These are not numbers that support Plaintiffs' contentions that Defendants' practices regarding COVID-19 boosters amount to a reckless failure to take actions to protect Plaintiffs.  On the contrary, these numbers show Defendants' COVID-19 protocols, including the administration of booster vaccinations, have been highly effective at preventing serious illness and deaths amongst even medically vulnerable detainees.  Plaintiffs cannot, therefore, show the facts and law are clearly in their favor for this claim.

     5.   <u>Plaintiffs Cannot Establish an Administrative Procedure Act Violation</u>

In their application for TRO, Plaintiffs allege the government's failure to provide booster shots in accordance with CDC guidelines violates its own "binding detention standards" which require compliance with CDC guidelines, and is therefore arbitrary, capricious, and violates the APA, and that this failure also violates the *Accardi* doctrine (*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)), which provides generally that courts may require an agency to follow the procedural and substantive standards contained in its own regulations.  Dkt. 2, p. 28.  Plaintiffs are incorrect in these allegations, and cannot show the facts and law are clearly in their favor for this claim.

It is true that ICE has promulgated detention standards, which are set forth in its PRR and other guidance provided to the individual detention centers.  In *C.G.B. v. Wolf,* (464 F.Supp.3d 174 (D.D.C. June 2, 2020)), Judge Cooper, noting the persuasiveness of similar decisions by courts in this jurisdiction, found that "allegations of 'general deficiencies in ICE's compliance with the PRR in its day-to-day operations of detention facilities across the country 'lack the specificity requisite for agency action.'" *Id.* at 226.

Moreover, ICE's own practices belie Plaintiffs' allegations, as ICE has been working to provide boosters for ICE detainees, and ICE detainees – including Plaintiffs – are receiving those boosters. *See* Rivera Decl. at ¶¶ 18-31; Hartnett Decl. at ¶¶ 3-4, 13; Jones Decl. at ¶¶ 3, 8; Alfieri Decl. at ¶¶ 8-15, 27-28; *see also Nat'l Immigration Project of Nat'l Lawyers Guild v. EOIR,* 456 F. Supp. 3d 16, (D.D.C. Apr. 28, 2020); *C.G.B.*, 464 F. Supp. 3d at 225 ("To the contrary, the record shows the agency is making reasonable efforts to implement the PRR at the facilities at issue in the face of 'the rapidly changing situation relating to the COVID-19 pandemic.'") (internal citations omitted).

Further, it already has been decided in this district that the implementation of the PRR, or failure to implement, at ICE detention facilities is not "agency action," much less "final agency action," as required under the APA and *Accardi*. *Id*. at 224-25.

> As the Court has already explained, most of the named Plaintiffs are unlikely to show that ICE has failed substantially to comply with the PRR at their detention facilities. The *Accardi* claims of those plaintiffs therefore stumble right out of gate. As to remaining Plaintiffs, their *Accardi* claims are nonetheless barred because they are not based on final agency action and are not the type of claims covered by *Accardi*.

*Id*. at 224. Plaintiffs therefore cannot establish a violation of the APA or *Accardi* doctrine.

6. <u>A TRO is Not Necessary to Prevent Irreparable Injury</u>

To prevail on a motion for TRO, Plaintiffs are required to demonstrate an irreparable injury, which Petitioners have not done here. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."). "[P]roving 'irreparable' injury is a considerable burden, requiring proof that the movant's injury is '*certain*, *great*[,] and *actual*—not theoretical—and *imminent*, creating a clear and present

need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Here, Plaintiffs describe their medical vulnerability, and then describe how COVID-19 cases have increased in detention facilities, and allege the "lack of any plan to provide COVID-19 booster shots to eligible individuals in detention." Dkt. 2, p.34. But as described herein, and in the accompanying declarations, ICE and its detention centers are administering boosters, including to Plaintiffs. Furthermore, ICE has created and implemented protocols and procedures, to prevent and mitigate the risk of harm to Plaintiffs. *See also C.G.B.,* 2020 WL 2935111 at *2-4 (outlining steps ICE and the CDC have taken to contain the virus in detention facilities). Furthermore, ICE has implemented measures specifically to identify and protect residents who are especially vulnerable and with high risk factors, which is the very subject of the *Fraihat* PI and the ongoing monitoring by the special master in that case.

In light of the actions taken by ICE, and the protocols and procedures already in place expressly to protect medically vulnerable individuals, Plaintiffs cannot show certain, imminent threat of harm that requires extraordinary equitable relief.

7. <u>The Threatened Injury Does Not Outweigh the Harm a TRO Would Inflict on the Government and Would Be Adverse to the Public Interest</u>

Finally, Plaintiffs have not demonstrated that "the balance of equities tips in their favor," and that "an injunction is in the public interest." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The government addresses these last two factors jointly, because where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

As detailed herein, the government has taken significant actions to address the needs of its detainees – to include medically vulnerable detainees. ICE and DHS continue those efforts, and continue to update their actions to provide the best care possible under the fast-changing parameters of the COVID-19 pandemic. Those efforts cover all areas of COVID-19 prevention, treatment, facility management, adherence to CDC guidelines, and include plans and implementation of vaccinations and booster vaccinations. *See* Rivera Decl. at ¶¶ 8-34; ICE PRRs. That the administration of booster vaccines to these three detainees did not proceed as quickly as they would have wanted does not balance the equities in their favor. This is especially true when the government is engaged already in the *Fraihat* class action, which specifically includes four of the plaintiffs (and all of the TRO plaintiffs). The government and public interest in providing uniform relief to a class as a whole, avoiding a multiplicity of actions, risk of inconsistent or conflicting adjudications heavily outweighs the risk to Plaintiffs, and a ruling to the contrary would be harmful to those interests.

### III. Conclusion

Plaintiffs failed to establish that the facts and law both clearly weigh in their favor. Furthermore, Plaintiffs' claims are subject to severance and transfer to the jurisdictions where the actions at issue (or lack thereof) are centered, are already the subject of an ongoing class action of which they are members, and cannot establish violations of either their rights under the Fifth Amendment or the Administrative Procedure Act. The Court therefore should deny the TRO motion requested by Plaintiffs.

Dated February 24, 2022.

| | |
|---|---|
| BRIAN M. BOYNTON<br>Principal Deputy Asst. Atty. General<br>Civil Division<br><br>JEFFREY S. ROBINS<br>Deputy Director<br>Office of Immigration Litigation | /s/ Jennifer A. Youngs_____<br>Jennifer A. Youngs<br>N.C. Bar No. 23925<br>Trial Attorney<br>U.S. Department of Justice, Civil Division<br>Office of Immigration Litigation<br>District Court Section<br>P.O. Box 868, Ben Franklin Station<br>Washington, D.C. 20044<br>Phone: (202) 451-7338<br>Fax: (202) 305-7000<br>Email: jennifer.a.youngs@gmail.com<br><br>*Attorneys for Federal Defendants* |

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2022, I electronically filed the foregoing RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER with the Clerk of Court by using the CM/ECF system, which will provide electronic notice and an electronic link to this document to all attorneys of record.

/s/*Jennifer A. Youngs*
Jennifer A. Youngs
Trial Attorney
N.C. Bar No. 23925